### CRAFT v. MAGNOLIA STORES CO.

(Division A.   Dec. 14, 1931.)

[138 So. 405.   No. 29655.]

J. P. & A. K. Edwards, of Mendenhall, for appellant.

B. B. McClendon and R. P. Phillips, both of Jackson, and W. D. Hilton, of Mendenhall, for appellee.

**McGowen, J.**, delivered the opinion of the court.

The appellant, Mrs. Craft, sued the Magnolia Stores Company for damages, in one count alleging slander and in another alleging libel.

At the conclusion of the appellant's testimony in the court below the appellee, by separate motions, requested

the court to direct a verdict for it on each count. The motion as to the second count charging libel was sustained. The motion as to the first count was then overruled. At the conclusion of all the testimony the appellee requested of the court a directed verdict for it on the first count charging slander, which was granted by the court.

No error is predicated here upon the action of the court as to the second count in excluding the evidence as to libel, and the only complaint here is that the case should have been submitted to the jury as to whether or not the agent, Harrison, of the Magnolia Stores Company, was acting within the scope of his employment at the time he made the statements attributed to him by the witnesses for the appellant.

The facts are these: On May 24, 1930, Mrs. Annie Craft went into appellee's store at Magee, Mississippi, to purchase a dress. The manager thereof was John Harrison, who was employed by appellee. Mrs. Craft was accompanied by Myrtle Craft, and she looked at dresses shown her by Harrison and other clerks, but declined to purchase, and left the store with her baby in her arms, and carried nothing therefrom. This was on Saturday afternoon. On Monday morning, Harrison, on checking up, found that a certain black dress had not been sold and was missing from the store. After discussion with all the clerks, who were women, he left the store and went to the home of a justice of the peace several miles from Magee and there made an affidavit for a search warrant charging that a black dress owned by him, Harrison, had been stolen, and charged Mrs. Annie Craft with the larceny thereof, and procured a search warrant. He thereupon accompanied the constable to the home of the father-in-law of Mrs. Craft, stating his mission to him. The father-in-law testified that Harrison told him Mrs. Craft stole a dress and he could prove it. Thereupon the constable and Harrison

searched the house; Mr. Craft, the father-in-law, being willing thereto. This declaration and search was about seven miles from the store.

Harrison testified that he was acting for himself in obtaining the search warrant and making the search. He denied using the language attributed to him, but admitted he told Craft, the father-in-law, that Mrs. Craft carried the dress from the store, or words to that effect.

The division manager of the Magnolia Stores Company testified that the Magnolia Store at Magee was one of a system of chain stores in the state, and that the management of the corporation was under contract with the National Detective Bureau Company to protect its interests with reference to stolen merchandise, and that Harrison had no authority to institute suits or to make search of property believed to have been stolen. The written contract between Harrison, as local manager, and his employers, was introduced in evidence, which discloses that he was to sell goods at the Magnolia Store, that he was to receive a salary and a bonus from certain profits arising from the sale, and that he was to account to his employers for the goods and for the proceeds of sale and do such things as are generally done in a store. Proof shows that he worked along with the others as a clerk in the store but had the direction of the other employees in that store.

There was no conflict in the evidence as to the duties of Harrison as the employee of the Magnolia Stores Company. There was no instruction from the master to Harrison, the servant, upon the subject of instituting prosecution or making search for stolen goods. It then became a question of law for the court upon the request for a peremptory instruction.

The question to be determined here, there being no express authority or instruction in the particular case, is whether or not it will be implied that Harrison was acting in the course of his employment and in the fur-

therance of his master's business, and whether or not Harrison's tort was committed in the course of his appointed duties.

In Davis v. Price, 133 Miss. 236, 97 So. 557, the rule is stated which we think is applicable to this case. " 'A master clearly cannot be held responsible for a tort committed in furtherance of his business, unless it is shown to have also been committed in the course of the appointed duties of the tort-feasor.' 6 Labatt's Master & Servant (2 Ed.), p. 6704."

As the supposed crime had been committed without consultation with his superiors—the servant left the place of business, and seven miles therefrom used slanderous language while he was apparently undertaking to assist the constable in executing a search warrant—it seems to us to be entirely clear that it was not comprehended by the master that its servant would be authorized by it to enter suit or institute court proceedings for property which the servant imagined or had good reason to believe had been stolen from the store of the master. As a citizen he had a right, if he had probable cause, in his own behalf, to ferret out a crime. There is no course of dealing shown that would indicate that he was acting for and on behalf of the master and in the discharge of his appointed duties when he made the slanderous statements. Neither can it be implied that he was acting within the scope of his employment. As illuminating the view of the court, we refer to the case of Natchez, C. & M. R. Co. v. Boyd, 141 Miss. 593, 107 So. 1, 2. In that case the servant Barnett's duties were to act as the railroad agent at Jayess and to keep water in the tank for the engines. This court held that guarding against the taking of water from the tank by trespassers is not within the scope of a servant's duty to keep water in the tank. The employee with his brother was guarding the tank and found William Boyd at the tank at night. The brother shot Boyd. The court there

used this language as to Barnett: "He was not instructed to prevent trespasses from being committed on the property of the appellant; consequently, so to do was not within the course or scope of his employment unless it was within the scope of his duty to keep water in the tank. It is true that preventing water being taken out of the tank by trespassers bore some relation to Barnett's duty to keep water in the tank, but it bore no relation to the manner in which he was to discharge that duty, which, it is manifest from the record, was by pumping water into the tank. Guarding the appellant's property from trespassers is a duty so different in character from that of pumping water into one of its tanks that a duty to do the one is not embraced in and cannot be implied from a duty to do the other."

The case of Fisher v. Westmoreland, 101 Miss. 181, 57 So. 563, Ann. Cas. 1914B, 636, was a suit for malicious prosecution. Westmoreland was running a sawmill, his saw broke, and he sent a negro over to an abandoned mill which belonged to Fisher and instructed the negro to take therefrom a saw and bring it to his mill and see if he could use it. In trying to use it, it was broken. Fisher's agent, Crigler, learned of this event. Fisher wrote Crigler authorizing him as agent to sell Westmoreland the mill, and, if it did not suit the latter to purchase, that Fisher would authorize him to swear out a warrant for the arrest of the negro who took the saw. Crigler made an affidavit against the negro and against Westmoreland charging them with grand larceny. Crigler had general authority as a caretaker in charge of the mill, and the court held that upon this general authority the institution of the prosecution by the agent must rest. The court held in that case that Crigler was authorized to do all things necessary to enable him to take care of the property, and he was authorized to cause the arrest of a person to prevent theft, but it was further

held that Crigler's act in causing the arrest of Westmoreland was clearly without the scope of his authority.

It is quite clear to us in the case at bar that the master here is not liable for the alleged tort because it was not committed in the course of the appointed duties of Harrison. And the servant, Harrison, while talking to the father-in-law of Mrs. Craft, was clearly acting on his own initiative and without the scope of his authority, and the slander was not uttered by him while acting in the course of his appointed duties.

It is further argued that appellant, by retaining the servant in its employ after knowledge of the offense herein, ratified the servant's wrongful act. Having reached the conclusion that the act of Harrison was unauthorized so far as the master was concerned, and that he was at the time acting upon his own initiative for purposes of his own and not in the performance of any duty expressed or implied which he owed the master, it then follows that the retention of Harrison in its employ with knowledge of his tortious act would not render the principal or master liable. See Wells v. Robinson Bros. Motor. Co., 153 Miss. 451, 121 So. 141.

The cases relied on by appellant are discussed and disposed of in the Wells case, supra. The mere fact that such employee is retained in the master's employ, and mere silence on the master's part relative to the slander, is not sufficient evidence that the master adopted the act, nor does it lead to the inference that he assumes responsibility for the servant's slander of another. In the case at bar there was no ratification.

Affirmed.